UNITED STATES DISTRICT COURT                          <u>FOR PUBLICATION</u>
EASTERN DISTRICT OF NEW YORK

---

P. A., JR., an infant minor,
JENNIFER RODRIGUEZ,

                                        Plaintiffs,

                - versus -                             10-cv-04661

CITY OF NEW YORK;
JOHN MATTINGLY,
Individually and in his capacity as Commissioner of the
Administration for Children's Services;
DEBORAH PRIDE, individually and in her capacity as a
Child Protective Specialist for the Administration for
Children's Services;
NATALIA ROSADO, individually and in her capacity as
a Child Protective Specialist for the Administration of
Children's Services;
ROSA SOSA, individually and in her capacity as a Child
Protective Specialist for the Administration for Children's
Services;                                              MEMORANDUM
ROBERT SALEMI, individually and in his                 AND ORDER
Capacity as a Supervisor of Child Protective Specialists
for the Administration for Children's Services;
ZANETTE SARGEANT, individually and in her capacity
as a Child Evaluation Specialist for the Administration for
Children's Services;
ST. VINCENT'S SERVICES, INC.;
CARLINE ANDERSON, Individually and in her capacity
as a caseworker for St. Vincent's Services, Inc.; and
ZOILA VILLALTA, individually and in her capacity as a
supervisor of caseworkers for St. Vincent's Services, Inc.,

                                        Defendants.

---

PATRICK ALFORD, SR.,
J.A., a minor, by her father and natural and legal guardian,
Patrick Alford,

                                        Plaintiffs,

                - versus -                             11-cv-01583

THE CITY OF NEW YORK
and
ST. VINCENT'S SERVICES, Inc., et al.,

                                        Defendants.

A P P E A R A N C E S:

LAW OFFICES OF AMBROSE WOTORSON
          26 Court Street
          Suite 1811
          Brooklyn, NY 11242-1118
By:     Ambrose W. Wotorson, Jr.

          *and*

Robert Alexander Osuna
          11 Park Place, Suite 600
          New York, NY 10007
          *Attorneys for Plaintiff Jennifer Rodriguez*

JAMES R. LAMBERT
          84 New Dorp Plaza
          Staten Island, NY 10306
          *Attorney for Plaintiffs Patrick Alford, Sr. and J.A.*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          Four Times Square
          New York, NY 10036
By:     Jonathan J. Lerner
          *Attorneys for Plaintiff P.A., Jr.*

BARRY MCTIERNAN & MOORE
          2 Rector Street
          14th Floor
          New York, NY 10006
By:     Suzanne M. Halbardier
          *Attorneys for Defendants City of New York and its Employees*

MARSHALL DENNEHEY WARNER & GOGGIN P.C.
          88 Pine Street
          21st floor
          New York, NY 10005
By:     Charles E. O'Bryan
          *Attorneys for Defendants St. Vincent's Services and its Employees*

# CONTENTS

BACKGROUND ................................................................................................................ 1

    A.   Historical Facts ................................................................................................. 1

    B.   Procedural History ............................................................................................ 6

    C.   Claims Alleged ................................................................................................. 6

DISCUSSION ................................................................................................................... 8

    A.   General Legal Standards ................................................................................... 8

       1.   Summary Judgment Standard ...................................................................... 8

       2.   Municipal Liability ..................................................................................... 9

       3.   Qualified Immunity .................................................................................... 9

    B.   *Rooker-Feldman* Challenge to Jurisdiction on Some Claims .......................... 10

    C.   Plaintiffs' Summary Judgment Motions .......................................................... 12

       1.   Claims Arising from the Initial Removal of PA ......................................... 12

         a.   Contours of Rights Alleged ................................................................. 13

         b.   Claims Against the Officers ................................................................. 17

         c.   Claims Against the City ....................................................................... 19

         d.   Parallel State Law Claims .................................................................... 23

       2.   Claims Relating to PA's Foster Care ........................................................ 24

         a.   Legal Standards .................................................................................. 24

         b.   Claims Against St. Vincent's ............................................................... 25

         c.   Claims Against the City ....................................................................... 30

    D.   Defendants' Summary Judgment Motions ....................................................... 30

       1.   PA's Remaining Claims ............................................................................ 30

         a.   Claims About Kinship Placement ........................................................ 30

         b.   Claims About Moran's English Competency ........................................ 31

         c.   Claims Against John Mattingly ........................................................... 32

         d.   Other Claims ...................................................................................... 33

       2.   Rodriguez's Claims .................................................................................. 35

       3.   Remaining Claims of Alford and JA .......................................................... 39

CONCLUSION ............................................................................................................... 40

JOHN GLEESON, United States District Judge:

These two cases arise from the tragic disappearance of a seven-year-old boy, PA, from his temporary custody with a foster mother in early 2010.  PA remains missing at the time of this opinion.  The plaintiffs in the case are the boy's two parents – his mother, Jennifer Rodriguez, and his father, Patrick Alford, Sr., proceeding separately – his minor sister, JA; and PA himself, for whom I appointed counsel.  All the plaintiffs and all of the defendants have moved for summary judgment on at least some claims.  For the reasons given below, I do not grant any of PA's or Rodriguez's motions; the defendants' motions are granted in part and denied in part; and I hold Alford's and JA's claims in abeyance pending further proceedings.

BACKGROUND

A.        *Historical Facts*

The following facts are taken from the parties' Local Rule 56.1 statements and affidavits.  Unless otherwise noted, the facts set forth below are uncontroverted, and citations to ECF numbers refer to the docket in No. 10-cv-4661.

Plaintiffs Jennifer Rodriguez and Patrick Alford, Sr. are the biological parents of the minor children PA and JA.  PA was born in November of 2002.  JA was born in April of 2005.  Defendant the City of New York ("City") is a municipal corporation.  The City maintains the Administration for Child Services ("ACS").  P.A's Rule 56.1 Statement, ¶¶ 1-3, ECF No. 314; City Def.'s Rule 56.1 Statement, ¶¶ 1-3, ECF No. 328; Alford's Rule 56.1 Statement, ¶¶ 1-6, ECF No. 325.

Rodriguez was known to ACS at least as early as September of 2009, when she and her boyfriend had a physical altercation in the children's presence that led to an incident report.  *See* City Defs.' 56.1 Statement ¶ 2.

1

On December 26, 2009, Rodriguez and a relative were arrested for shoplifting in the presence of JA and PA. The police permitted Rodriguez to call a family member to pick up the children. At approximately 5:40 p.m. on the day of the arrest, ACS received a report from the State Central Registry notifying them of Rodriguez's arrest. A child protective services worker spoke with the source of the report and was told the children had been picked up by Rodriguez's mother and taken to Brooklyn. City Defs.' Rule 56.1 Statement, ¶¶ 6-9, ECF No. 328.

On December 28, 2009, Robert Salemi, an ACS supervisor, directed Natalia Rosado, a Child Protective Specialist ("CPS"), to make contact with Rodriguez. Salemi was concerned about eleven prior cases against Rodriguez's mother (the children's grandmother), who had taken physical custody of the children after the shoplifting arrest. Later that day, Rosado went to Rodriguez's home to speak with Rodriguez. Rodriguez admitted to the shoplifting and told Rosado of a prior arrest she had not reported to ACS. Rosado inquired into Rodriguez's mental health, and Rodriguez stated she had no mental health issues. That statement was false; Rosado knew Rodriguez was taking psychotropic medications. City Defs.' Rule 56.1 Statement, ¶¶ 12-18, ECF No. 328. An entry was later made into the ACS database, Progress Notes, acknowledging that Rodriguez had support from her family and that she had informal arrangements regarding the children with her maternal aunt and Alford. *See* Lerner Aff. in Support of Mot. for Summ. Judg., ECF No. 315, Ex. P, at PA-ACS-0039.

At around 3:45 p.m. the next day (December 29, 2009), Rodriguez phoned Salemi to request assistance in entering an inpatient drug treatment program to deal with her marijuana usage. Salemi informed Ms. Rodriguez that marijuana use alone would typically not warrant an inpatient program. Ms. Rodriguez then revealed that she had also been using PCP in her home.

Salemi directed CPS Deborah Pride and CPS Rose Sosa to go immediately to Rodriguez's home. Pride and Sosa arrived at the home after 5:00 p.m. They found Rodriguez in an impaired state – she could barely stand and was speaking incoherently. JA was present but PA was not. An unknown adult man was also in the home, but he refused to identify himself to Pride or Sosa. CPS tried to elicit PA's whereabouts from Rodriguez. Due to her impaired state, Rodriguez was able to say only that PA was with an aunt. Rodriguez could not identify the aunt or provide an address. Nor could she provide contact information for a responsible adult who could immediately care for JA. Pride and Sosa reported their findings to Salemi and informed him they had concerns about whether Rodriguez could adequately care for the children at the time. City Defs.' Rule 56.1 Statement, ¶¶ 20-36, ECF No. 328.

Based on the information provided to Salemi, he consulted with his manager, Reinaldo Gibbs ("Gibbs"), a Child Protective Manager ("CPM"). Gibbs authorized the removal of both PA and JA pursuant to an ACS policy in which a decision to remove a child on an emergency basis, without a court order, must be approved by a CPM. PA's Rule 56.1 Statement ¶ 24, ECF No. 314. Pride and Sosa removed JA from the Rodriguez home and headed back to the Staten Island Field Office. Once there, Pride and Sosa conferred with Rosado about PA's possible location. Rosado recalled that PA had a great-aunt, Blanca Toledo, in Brooklyn. Rosado, Pride and Sosa proceeded to Brooklyn to retrieve PA. PA was in Toledo's home, which was also home to several other adults. Upon arriving at Toledo's home, Rosado informed Toledo in Spanish that the three CPS workers were there to remove PA. At the time of the removal, PA was apparently safe in the home and care of Toledo. However, Toledo did not have legal custody and her home had not been cleared by ACS (i.e., no criminal check of family

members had occurred, nor had ACS checked for any prior domestic abuses or ACS cases).

Toledo did not oppose the removal.  City Def.'s Rule 56.1 Statement, ¶¶ 39-46, ECF No. 328.

Later that night, both PA and JA were transported to the main ACS facility in

Manhattan, where they awaited placement in a foster home.  ACS employee John McLaughlin

located a foster home in Brooklyn.  McLaughlin attempted to find a foster home in the children's

home borough of Staten Island, but none was available.  JA and PA were placed in the non-

kinship foster home of Librada Moran.  *Id*. ¶¶ 47-50. The placement was made at 11:00 p.m. and

the children were taken the next morning, December 30, 2009, to Moran's home.

A hearing – the "initial child safety conference," or ICSC – was held the same

morning.  PA's Rule 56.1 Statement ¶¶ 42, 43.  Both parents, as well as various relatives of each,

attended.  ACS agreed to explore kinship placement.  City Defs.' Rule 56.1 Statement ¶ 62.

After the December 30 conference, Rodriguez told Alford that Toledo's husband had sexually

molested Rodriguez as a child; this information eventually reached ACS, though the parties

dispute precisely when.

Later on December 30, the family court held a formal custody hearing.  ACS

suggested placing JA and PA with Alford but had two concerns:  (1) there was a prior domestic

violence incident between Alford and Shareema Bruington, with whom Alford was then living

and with whom he had two other children; and (2) the shelter that Alford was living in might not

be able to accommodate two more children.  City Defs.' Rule 56.1 Statement ¶ 78-80.  The

family court judge approved the children's placement in foster care on a temporary basis.  *Id*.

¶ 81.

On January 6, 2010, Alford and Rodriguez again appeared in family court,

represented by counsel.  ACS had determined that both JA and PA should be paroled into

4

Alford's custody.  But Rodriguez objected and raised a new allegation:  that Bruington had previously hit PA and locked him in a closet.  *Id*. ¶¶ 90-95.  ACS requested additional time to investigate that allegation, and the judge and counsel for the children agreed that additional time was needed.  *Id*. ¶¶ 97-99.  The court set the next hearing for January 26, 2010.  *Id*. ¶ 101.

Meanwhile, PA and JA remained in Moran's custody.  Over the next few weeks, PA showed some alarming behavior.  For example, on January 8, 2010, Rodriguez (along with her sister, and Toledo) visited PA and JA under supervision at St. Vincent's.  PA repeatedly said that he was going to leave with his mother, and that he was going home; he also kept trying to leave the office, even when his mother was present.  *See* Ex. Q at 27, ECF No. 315-17, in No. 10-cv-4661.  On a January 21 visit to the foster home, PA kept trying to unlock the door and leave.  *Id*. at 43-44.  During that same visit, PA said he wished he were dead and attempted to cut himself with scissors.  Ex. Q.  His foster mother reported a variety of alarming behavior, such as smearing feces on the wall and hitting other children, *id.* at 35, and incidents where he would hit himself in the head and say "oh, my head, my head," *id*.  He also threatened to kill his sister.  *Id*. at 39.

A St. Vincent's psychologist, Eugene Plotnick, performed an initial evaluation of PA on January 14, 2010.  A treatment note discussed PA's violent outbursts, difficulty concentrating, lying, and claims that he wanted to kill his sister, JA.  PA also exhibited what Dr. Plotnick thought might be psychotic features, saying that "Jason is inside me, he's telling me what to do," and saying that his legs were trying to make him get out of his chair.  Plotnick felt some of the behavior might be exaggerated, but he also stated that PA needed urgent attention and that he "wanted to expedite a psychiatric evaluation and treatment intervention."  Ex. W to

PA SJ Mot., ECF No. 315-23 in No. 10-cv-4661.  Nonetheless, Plotnick judged that PA was not

an "imminent risk to self or others."  *Id.*

On January 22, 2010, PA ran away from Moran's foster home.  City Defs.' 56.1

Statement, ¶ 102.  He has not been found.  Shortly after PA disappeared, Alford was granted

custody of JA.

B.      *Procedural History*

These cases began when Rodriguez filed a complaint on October 12, 2010.  *See*

Rodriguez Complaint, ECF No. 1 in No. 10-cv-4661.  Alford filed a complaint on behalf of

himself and JA on March 31, 2011.  *See* Alford Complaint, ECF No. 1 in No. 11-cv-1583.

Because PA's parents could not agree to jointly represent his interests, I appointed *pro bono*

counsel for PA on June 6, 2011, *see* ECF No. 70.  I later clarified that appointed counsel were

also appointed as PA's guardian ad litem.  *See* Order, December 16, 2011.

PA moved for summary judgment in March of 2014.  All plaintiffs and all

defendants in both cases have now moved for summary judgment on at least some of the

plaintiffs' claims.  I heard argument on the motions on July 11, 2014.

C.      *Claims Alleged*

The following table summarizes the claims of PA and Rodriguez and their

dispositions.  (I conclude that Alford's and JA's claims should not be resolved at this time; *see*

Discussion D.3, *infra*.)

*PA's Claims*

| Number | Against | Description | Disposition |
|--------|---------|-------------|-------------|
| 1 | City Defs. | § 1983, improper removal of PA | Dismissed |
| 2 | All Defs. | § 1983, failure to initially place PA with relatives | Dismissed against organizations, but may proceed against relevant individuals |
| 3 | All Defs. | § 1983, failure to reassign | May proceed |

6

| | | PA to relatives | |
|---|---|---|---|
| 4 | All Defs. | § 1983, failure to place PA in English-speaking home | May proceed |
| 5 | All Defs. | § 1983, failure to care for PA once in custody | May proceed |
| 6 | All Defs. | NY State Const. art. I, §6 | May proceed to the extent it mirrors federal claims |
| 7 | City Defs. | State negligence mirroring claim 1 | Dismissed |
| 8 | All Defs. | State negligence mirroring claims 2 & 3 | May proceed |
| 9 | All Defs. | State negligence mirroring claim 4 | May proceed |
| 10 | All Defs. | State negligence mirroring claim 5 | May proceed |
| 11 | ACS & St. Vincent's Defs. | State intentional infliction of emotional distress | Dismissed |
| 12 | All Defs. | State negligent infliction of emotional distress | May proceed |
| 13 | ACS & St. Vincent's Defs. | State false imprisonment | May proceed |

*Rodriguez's Claims*[1]

| Number | Against | Description | Disposition |
|---|---|---|---|
| 1 | City Defs. | § 1983, procedural due process in initial removal | Dismissed |
| 2 | All Defs. | § 1983, procedural due process in foster placement and care | Dismissed |
| 3 | All Defs. | § 1983, substantive due process in foster placement and care | Dismissed |

---

[1]      I continue to follow Judge Gold's recommendation not to permit putative claims 4 and 5 in Rodriguez's Third Amended Complaint.  *See* Discussion D.2, *infra*, for further detail.

DISCUSSION

A.       *General Legal Standards*

1.       *Summary Judgment Standard*

A court may grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

The movant may show that summary judgment is appropriate by showing that no reasonable jury could find for the non-moving party based on the evidence offered in support of the claim. *See Powell v. National Bd. of Medical Examiners*, 364 F.3d 79, 84 (2d Cir. 2004) ("[T]he existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant.") (citing *Anderson*, 477 U.S. at 252).

The mere fact that I have been presented with competing motions for summary judgment, and that all parties contend that the case can be disposed of as a matter of law, does not require that I grant summary judgment to some moving party. Rather, I must evaluate each motion separately, each time viewing the evidence in the light most favorable to (and resolving

8

ambiguities in favor of) the non-moving party.  *See, e.g., Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean*, 667 F.2d 305, 313-14 (2d Cir. 1981).

        2.     *Municipal Liability*

      In *Monell v. Department of Social Services*, the Supreme Court held that in certain instances a municipality may be held liable for the tortious conduct of its employees.  436 U.S. 658 (1977).  However, "governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988); *see also Bd. Of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("A municipality may not be held liable . . . solely because it employs a tortfeasor.").  In the ordinary case, "[e]stablishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality."  *Askins v. Doe No. 1*, 727 F.3d 248 (2d Cir. 2013).

        3.     *Qualified Immunity*

      "[Q]ualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known."  *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568-69 (2d Cir. 1996).  "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  In deciding a question of qualified immunity, "[t]he salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional."  *Tolan*

9

*v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation marks and alterations omitted). When deciding qualified immunity at the summary judgment stage, a court must, as in resolving any other summary judgment motion, view the evidence in the light most favorable to the nonmoving party, and may not resolve genuine factual disputes. *See id.*

B.          *The* Rooker-Feldman *Challenge to Jurisdiction on Some Claims*

The City Defendants argue that all of the claims arising from PA's initial emergency removal are barred by the so-called *Rooker-Feldman* doctrine.[2]  The rule derived from *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), as clarified by the Supreme Court in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005), prohibits federal courts below the Supreme Court from exercising what amounts to appellate jurisdiction over a state court judgment.  The principle follows from the proper interpretation of 28 U.S.C. § 1257(a), which gives the United States Supreme Court the sole authority to review state court decisions, regardless of any other grants of jurisdiction to lower federal courts.  *See Exxon*, 544 U.S. at 291-92 ("§ 1257, as long interpreted, vests authority to review a state court's judgment solely in [the United States Supreme Court]").

As articulated by the Second Circuit, four elements must be satisfied for a federal court to be deprived of jurisdiction under *Rooker-Feldman*:

> First, the federal-court plaintiff must have lost in state court.
> Second, the plaintiff must complain of injuries caused by a state-court judgment. Third, the plaintiff must invite district court review and rejection of that judgment. Fourth, the state-court

---

[2]          PA protests that I already ruled on this issue in denying motions to dismiss.  While that is true, I discuss the matter here both because I did not issue a written opinion on the motion to dismiss, and because of my ongoing duty to ensure that subject matter jurisdiction exists.  PA also protests that the City has been less than forthcoming both by failing to acknowledge my earlier decision in this case and by failing to note in its brief cases adverse to its position to which the City itself was a party.  I do not find that the City's brief crosses the line of permissible advocacy in either regard.

> judgment must have been rendered before the district court
> proceedings commenced – i.e., *Rooker–Feldman* has no
> application to federal-court suits proceeding in parallel with
> ongoing state-court litigation. The first and fourth of these
> requirements may be loosely termed procedural; the second and
> third may be termed substantive.

*Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (internal alterations,

citations, and quotation marks omitted).

Since *Exxon*, the Second Circuit has had a few chances to address the scope of the

*Rooker-Feldman* doctrine specifically in the child custody context.  First, in a long passage of

dicta in *Hoblock*, 422 F.3d at 87-88, the Court discussed a hypothetical federal suit attacking a

state court's final child custody disposition as an example of the sort of challenge the refined

*Rooker-Feldman* doctrine would bar.  Later, in *Green v. Mattingly*, 585 F.3d 97, 101-03 (2d Cir.

2009), the Court applied that understanding to a case actually involving child custody.  Critical

to the outcome of *Green* was the nature of the state court relief purportedly "appealed" from in

the federal case.  The plaintiff was a parent whose child had been removed from her custody by

state officials; a state family court order permitted the *temporary* removal of the child.  But four

days later the child was returned to her custody following a second order of the family court.  *See

id*. at 102.  Because the removal was temporary, there was no final order from which she could

"appeal."  The Second Circuit thus could not find her to be a "state-court loser."  Furthermore, at

the time she filed the federal action, she could not "'invite district court review and rejection' of

a state court judgment," *id*. (quoting *Hoblock*, 422 F.3d at 85), because her child had been

returned to her.  For these two reasons, the Court held that *Rooker-Feldman* doctrine did not

apply to deprive the federal district court of jurisdiction.  Finally, in *V.S. v. Muhammad*, 595 F.3d

426 (2d Cir. 2010), the Second Circuit again held that the *Rooker-Feldman* doctrine did not bar a

§ 1983 action challenging the removal of a child.  In that case, ACS had, at the time of the

federal proceedings, already withdrawn claims against the parents of a child, and the child had been returned to the parents' custody.  *Id*. at 430.

I find no meaningful distinction between the facts in this case and those in *Green*. It is undisputed that the state family court in this case never issued a final order depriving either parent of PA's custody.  Indeed, the state court granted custody of JA, PA's sister, to Alford shortly after PA disappeared.  Because of PA's tragic disappearance, the state court never had a chance to revisit its earlier ruling permitting PA's temporary placement in foster care, but that does not render its initial decision to uphold the emergency removal "final" for the purposes of the *Rooker-Feldman* doctrine.  Just as in *Green*, the family court proceedings here did not result in an adverse disposition of which the plaintiffs could seek review in federal court.  That is true even though the state court's decision approving the initial removal had the effect of ratifying the officers' conduct.

My view is reinforced by the purposes of the *Rooker-Feldman* doctrine.  The family court proceedings never reached a final outcome that would be appealable up the line of state courts and eventually (via certiorari) in the United States Supreme Court.  As made clear in *Exxon*, the *Rooker-Feldman* doctrine is principally focused on the narrow issue of how Congress has decided to divide up jurisdiction among the federal courts.  As in *Green*, the plaintiffs here "had no reason to seek – and could not have sought – review of the Family Court's temporary removal order by the U.S. Supreme Court under 28 U.S.C. § 1257."  585 F.3d at 102.  In sum, the City's argument that the family court's order ratifying the officers' removal decision bars PA's current claims is inconsistent with *Green*, and for that reason I reject it here.

C.        *Plaintiffs' Summary Judgment Motions*

1.        *Claims Arising from the Initial Removal of PA*

PA moves for summary judgment against the City and ACS on his claims under § 1983 that City officials violated his rights under the Fourth and Fourteenth Amendments when they took custody of him on December 29, 2009.[3]  PA's parents, Rodriguez and Alford, also move for summary judgment on procedural due process claims arising from PA's removal; because the claims are very similar, I discuss them together (except as noted).  In addition, the City Defendants move for summary judgment on all of the plaintiffs' claims.

### a.   The Contours of the Rights

A child has a Fourth Amendment right to be free from unreasonable seizures, and that right is implicated when he is taken into custody by state officials:  "When a child is taken into state custody, his or her person is 'seized' for Fourth Amendment purposes.  The child may therefore assert a claim under the Fourth Amendment that the seizure of his or her person was 'unreasonable.'"  *Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012), *cert. denied,* 133 S. Ct. 980 (2013).  PA's argument does not focus on the Fourth Amendment theory that it was "unreasonable" to take him from Toledo's house (and from the legal custody of his parents).[4]  Instead, he focuses on due process, arguing that there is no genuine dispute that emergency circumstances did not exist, and therefore that the City was not authorized to take PA.[5]

---

[3]         Two additional causes of action implicate similar rights:  the sixth, alleging violation of the New York Constitution's due process clause, and the thirteenth, for false imprisonment.  However, PA moves for summary judgment on only four causes of action in his Second Amended Complaint:  the first (unlawful removal in violation of § 1983); the fifth (failure to protect him while in foster care in violation of § 1983); the seventh (negligent removal); and the tenth (negligent failure to protect him while in foster care).

[4]         Indeed, although *Southerland* mentions the Fourth Amendment as a theory of liability under § 1983 for the seizure of a child from custody, the opinion notes that the law of the Second Circuit is undeveloped on such claims.  *See Southerland*, 680 F.3d at 155-56 & n.25 (outlining, based in part on the law in other circuits, three theories of Fourth Amendment liability a child might assert).

[5]         Because the brief for PA articulates the basis of this claim much more clearly than either parent's brief does, I address only his arguments.

Both child and parent possess a constitutionally protected liberty interest in the child's remaining in parental custody. *See id.* at 142; *see also Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 371 (E.D.N.Y. 2011) ("Parents have a constitutionally protected liberty interest in the care, custody, and management of their children, and children have a similarly protected liberty interest in not being separated from the intimacy of daily family association.") (citing *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000)) (internal quotation marks omitted).  Children have a parallel liberty interest in not being separated from their parents. *Southerland*, 680 F.3d at 142 (citing, inter alia, *Kia P.*, 235 F.3d at 759).

The due process clause protects these liberty interests by generally forbidding the state from removing a child from his home without notice and an opportunity to be heard. "However, 'in emergency circumstances, a child may be taken into custody by a responsible State official without court authorization or parental consent.'" *Southerland*, 680 F.3d at 149 (quoting *Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003)).  In such emergency circumstances, an adequate hearing is still required, but it may occur after the removal. *See Southerland*, 680 F.3d at 151 n.22.  But even when the child is in danger, officers should not feel free to remove him without an initial hearing and court order when such a pre-removal hearing is feasible:  "If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, ex parte or otherwise, for the child's removal, then the circumstances are not emergent; there is no reason to excuse the absence of the judiciary's participation in depriving the parents of the care, custody and management of their child." *Tenenbaum v. Williams*, 193 F.3d 581, 594-95 (2d Cir. 1999) (footnote omitted); *see also E.D. ex rel. V.D. v. Tuffarelli*, 692 F. Supp. 2d 347, 362 (S.D.N.Y. 2010) (discussing *Tenenbaum*); *Porter v. City of New York*, 1:03CV6463-ENV-LB, 2007 WL 1791149, at *2-5 (E.D.N.Y. June

14

19, 2007) (finding emergency circumstances in part because of the inability, due to time of day, to obtain a family court order).

"To show that emergency circumstances existed, the government must offer objectively reasonable evidence that harm was imminent." *Southerland*, 680 F.3d at 149 (internal quotation marks and alterations omitted).  The Second Circuit has acknowledged that it "has not attempted to set forth exhaustively the types of factual circumstances that constitute imminent danger justifying emergency removal as a matter of federal constitutional law," but among the qualifying circumstances are "the peril of sexual abuse, the risk that children will be left bereft of care and supervision, and immediate threats to the safety of the child."  *Id.* (internal quotation marks, alterations, and citations omitted).  Thus, while only risk of severe harm will justify emergency removal, state officers may justifiably seek to avoid not only affirmative acts of violence or abuse, but also the absence of care and supervision – that is, neglect.

The most relevant emergency circumstance exception here is the "risk that children will be 'left bereft of care and supervision.'"  *Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003) (quoting *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir. 1991)).  A clear example of such a risk occurred in *Duchesne v. Sugarman*, 566 F.2d 817, 825-26 (2d Cir. 1977), in which the Second Circuit held that emergency removal was justified when a mother sought psychiatric treatment at Bellevue Hospital and was unexpectedly admitted for inpatient treatment for six days.  Although the children had been left in the care of a neighbor with whom the mother regularly shared babysitting duties, *id.* at 822, the Court found that City officials were justified in taking custody of the children:

> The trial court concluded that '(t)he initial custody in December
> 1969 was clearly proper since the facts show an emergency
> situation with the mother in the psychiatric ward of Bellevue
> Hospital and no one to take care of the children.' We agree that the

15

> evidence establishes that the taking of the children was justified at the outset by an emergency. As such, as a matter of constitutional law, the initial removal of the children without parental consent or a prior court order was permissible.

*Id*. at 825-26 (internal citation omitted). The risk of neglect has also been found to be sufficiently serious to justify removal where a caregiver, though present, would likely be unable to provide adequate care on a short-term basis. For example, in *Porter v. City of New York*, the Court granted summary judgment to the defendants based on emergency circumstances where a child's mother and grandmother had a history of serious alcohol abuse problems, the child was found with his inebriated grandmother on a Friday afternoon, and it was impossible to obtain a family court order before removing him. 2007 WL 1791149, at *2-5.

Finally, in determining whether emergency circumstances existed, the facts must not be viewed in hindsight. Rather, the question is whether the officer had a reasonable basis for concluding at the time of removal that it was necessary based on emergency circumstances. This "reasonable basis" standard developed in the context of suspected child abuse. *See Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104-05 (2d Cir. 1999). The "reasonable basis" standard is the *merits* determination, which applies to the officer's judgment of the facts; it is separate from the protection of qualified immunity, a legal question which asks whether a reasonable officer could have (erroneously) believed at the time that his conduct was legally permissible. *See id.* at 107 n.10. Caseworkers must deal with situations as they unfold, and they must worry about the horrific possibility that a risk to a child will materialize. Furthermore, the state's power to interfere in the constitutionally protected child-parent relationship is increased "'in circumstances where the protection is considered necessary as against the parents themselves.'" *Id*. at 104 (quoting *Manzano v. South Dakota Dep't of Social Servs.*, 60 F.3d 505, 510 (8th Cir. 1995)). That concern is especially acute in cases of parental abuse, but the risk of neglect or the

16

possibility that a child will go without care is equally attributable to a parent, and potentially just as dangerous.

In sum, "[t]he question on a summary judgment motion is whether a rational juror 'could not fail to conclude that defendants had an objectively reasonable basis for believing that the prompt separation of [PA from his parents], without pausing to obtain a court order, was necessary.'" *Porter*, 2007 WL 1791149, at *4 (quoting *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 519 (2d Cir. 1996)).

### b. The Claims Against the Officers

Against that legal backdrop, I conclude that no reasonable juror could fail to find that the officers reasonably believed there were emergency circumstances justifying PA's removal. The plaintiffs' arguments rest on a misapprehension of the law. An "emergency" for the purposes of the inquiry here is not limited to a burning building or a closed fist. Especially when (as was the case here) the family court is not open, *see Tenenbaum*, 193 F.3d at 594-95, it is enough if the facts would cause a reasonable officer to believe that the child is at a substantial risk of neglect.

The plaintiffs vehemently dispute the reasonableness of the agents' determination that PA was in danger. PA points to specific deposition excerpts in which defendants Salemi and Gibbs admit that, once officers traveled to Rodriguez's home and spoke to her, Salemi and Gibbs determined that PA should be found and taken into temporary custody – even though they did not then know PA's condition or whereabouts. *See* PA Br. in Support at 18-19, ECF No. 313. PA further argues that once officers found him at the house of his aunt, he was in no immediate danger.

17

However, it is undisputed that ACS officers had a wealth of alarming information about PA's mother and legal custodian, Rodriguez.  Rodriguez personally called ACS and, while high on marijuana and PCP, asked to be placed in drug treatment, which caused Salemi to dispatch Pride and Sosa to Rodriguez's home.  Once they arrived, Rodriguez was unable to tell ACS officers the name of an unidentified man present at her apartment, and she was also too intoxicated to tell officers where PA was (just that he was with an aunt).  PA's 56.1 Response, ECF No. 363-1, ¶¶ 20-36.  All of this occurred while JA was present in Rodriguez's home.  *Id*. ¶ 26.  Furthermore, the agents had reason to believe that Rodriguez's previous delegations of childcare responsibility to relatives were unwise, given the poor record of the children's maternal grandmother.

Under these circumstances, the fact that Toledo's home did not immediately appear to endanger PA at the time he was removed does not undermine the reasonableness of the agents' decision to remove him.  Contrary to PA's suggestion, it is not preposterous to think that Rodriguez might have sobered up enough to wonder where PA was – and then made efforts to get him back from Toledo, placing him back in the dangerous environment that was (indisputably) not suitable for a child, even on a short-term basis.  Furthermore, although PA argues that Toledo's home presented no danger to the child, it is also undisputed that ACS workers had not previously cleared her home and did not have enough time to thoroughly investigate the home and its occupants.  A case worker cannot be *required* by the federal constitution to leave a child in an unknown home simply because it appears safe.

In considering these claims, I am guided by larger principles of federalism, and of the proper division of authority among child protective workers, state family courts, and the federal courts.  I do not take lightly the rights of both parent and child to remain united as a

18

family; it is one of the most fundamental liberty interests that the federal Constitution protects

from state interference.  But the role of federal courts in protecting that right is reserved for

extreme cases.  Unlike (for example) the criminal justice system, for which the federal

Constitution enumerates many specific rights and even some of the standards for policing

violations of those rights, only high-level notions of fairness, due process, and liberty inform

federal judicial decisionmaking about the right of family integrity.  The primary authority for

protecting that right from state interference rests with our democratically elected state and local

governments.  Yet at the same time, we also demand that those governments *protect* children.

Given the competing demands we place on the states – not to interfere with families, while still

keeping children safe – it cannot be that a reasonable choice to err on one side of that dialectic

gives rise to liability under the federal Constitution.  PA's disappearance was tragic, and it would

not have occurred but for the agents' decisions.  But I conclude as a matter of law that their

conduct was based on a reasonable judgment of what was best for PA under the circumstances.[6]

### c.   *Claims Against the City*

Though my conclusion that the individual defendants did not act unlawfully by

removing PA precludes the imposition of municipal liability, I write to explain my view that

plaintiffs' theory of municipal liability also lacks support in the legal precedents on which it is

based.  Furthermore, if I am mistaken about the merits decision on the officers' conduct, and the

---

[6]      Because I grant summary judgment on the merits, I need not dwell on the question of qualified
immunity.  Obviously, having found the removal of PA to be reasonable on the merits, I further conclude that, at the
very least, reasonable Child Protective Specialists could disagree on that issue, and that qualified immunity would
therefore protect the individual defendant officers from liability even if they had acted unlawfully.  *See Southerland*,
680 F.3d at 141 (even where the law is clearly established and violated, a caseworker is nevertheless entitled to
qualified immunity if it was objectively reasonable for him or her to believe the challenged removal was lawful).

officers are protected only by qualified immunity, the following reasoning explains why the City would still not be liable.[7]

As alleged against the City, the plaintiffs must demonstrate that the challenged actions represented official policy or custom.  PA's principal argument in favor of *Monell* liability is that even if the decision to remove PA was not the result of an oft-repeated, officially promulgated policy or practice of the City, it was nonetheless made by sufficiently high-ranking officials that the acts must be attributed to the City as official action.  This form of *Monell* liability was first articulated by the Supreme Court in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), where the Court held that a municipality could be liable even for a single decision made by a government official, as long as the decision was "properly made by that government's authorized decisionmakers," since such an act "surely represents an act of official government 'policy' as that term is commonly understood."  *Id*. at 481.

For the municipality to be liable for a single act, the plaintiff must identify a responsible municipal official who "has final authority over significant matters involving the exercise of discretion."  *Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) (internal quotation marks omitted).  The policymaker must, with respect to the particular conduct alleged in the case, be "'responsible under state law for making policy *in that area* of the

_____

[7]        That is, if the officers' conduct was illegal, but they were nonetheless protected by qualified immunity, the City could theoretically be liable.  As I recently wrote in another case against the City and police officers,

> It is true that a municipality cannot be liable under *Monell* unless the plaintiff is harmed by the illegal act of a municipal employee. But a municipality may be liable for adopting an illegal policy or custom even though the individuals implementing that policy or custom are immune because none of them violated clearly established law. *See generally Askins v. Doe No. 1*, 727 F.3d 248, 253-54 (2d Cir. 2013). A contrary rule would effectively extend qualified immunity from individuals to municipalities.

*Bell v. City of New York*, 13-CV-5317 JG VMS, 2013 WL 6268083, at *3 n.1 (E.D.N.Y. Dec. 4, 2013).

[municipality's] business.'" *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion)).

Here, the plaintiffs identify Reinaldo Gibbs, the Child Protective Manager on the case, who made the decision to remove PA on an emergency basis.  As a matter of written City policy, "[o]nly the CPM in charge of the case is the decision-maker for each emergency custody decision."  Child Safety Alert from Commissioner John B. Mattingly:  Conducting Emergency Removals of Children (Nov. 18, 2010), Ex. S, DE 315-19.  The City does not dispute this characterization.

I conclude that Gibbs was not a "policymaker" within the meaning of the cases interpreting *Pembaur*, nor was his decision one of "policy," so the City cannot be held responsible under § 1983 for his actions.  As my starting point, I note that *Pembaur* did not intend to turn every exercise of discretion by a higher-ranking municipal official into an act attributable to the municipality:

> The fact that a particular official – even a policymaking official –
> has discretion in the exercise of particular functions does not,
> without more, give rise to municipal liability based on an exercise
> of that discretion.  The official must also be responsible for
> establishing final government policy respecting such activity
> before the municipality can be held liable.

*Pembaur*, 475 U.S. at 481-83.  The cited section of the opinion garnered only a plurality of the justices, but courts have found useful that language and the following accompanying footnote:

> Thus, for example, the County Sheriff may have discretion to hire
> and fire employees without also being the county official
> responsible for establishing county employment policy. If this
> were the case, the Sheriff's decisions respecting employment
> would not give rise to municipal liability, although similar
> decisions with respect to law enforcement practices, over which
> the Sheriff is the official policymaker, would give rise to municipal
> liability. Instead, if county employment policy was set by the
> Board of County Commissioners, only that body's decisions would

21

> provide a basis for county liability. This would be true even if the
> Board left the Sheriff discretion to hire and fire employees and the
> Sheriff exercised that discretion in an unconstitutional manner; the
> decision to act unlawfully would not be a decision of the Board.
> However, if the Board delegated its power to establish final
> employment policy to the Sheriff, the Sheriff's decisions would
> represent county policy and could give rise to municipal liability.

*Id.* at 483 n.12; *see also, e.g., Hardy v. Town of Greenwich*, 3:06CV833 (MRK), 2009 WL

2176117, at *3-4 (D. Conn. July 22, 2009) (discussing the footnote).  In *Pembaur* itself, for

example, the challenged action was ultimately attributable to a county prosecutor's decision to

forcibly break down a door.  *See* 475 U.S. at 472-73.  The county prosecutor was authorized

under Ohio law to make county policy on law enforcement decisions.  *Id.* at 484-85.  The

prosecutor was thus both authorized to make the final decision about whether to break down the

door, and in fact did so, consistent with his views on proper law enforcement policy.

Here, by contrast, the plaintiffs have not alleged that Gibbs, though empowered to

exercise discretion over the final emergency removal decision, was also the official who made

City *policy* about the circumstances under which such decisions would be made, the factors that

would go into them, and so forth.  This case is therefore similar to a line of cases in which courts

have held that allegedly discriminatory employment decisions were not attributable to

municipalities because the final decisionmakers did not also set employment policy.  *See, e.g.,*

*Hardy*, 2009 WL 2176117, at *5 (citing cases).

The authority plaintiffs rely on to support *Pembaur* liability is distinguishable.

For example, in *Bray v. City of New York*, No. 04 Civ. 8255 (WHP), 2005 WL 2429504

(S.D.N.Y. Sept. 30, 2005), the plaintiffs challenged the seizure of bicycles by the NYPD

following a protest ride.  The City was found liable on a *Pembaur* theory because plaintiffs

challenged the decision of a high-ranking police officer who had, by his own admission,

22

"responsibility for overseeing the operations of all of the precincts in Manhattan south of 59th Street." *Id.* at *8. Although he was "not at the top of the NYPD's chain of command," he was "the chief officer directing how the response was going to be to [the protest ride," and he had in fact "personally directed officers" to remove the bicycles in question. *Id.* (internal quotation marks omitted). Thus, the officer not only had discretion; he also created the policy that he personally applied to the situation on behalf of the NYPD.[8]

In sum, I grant summary judgment to defendants on all claims under § 1983 arising from the initial action of removing PA.

### d. *Parallel State Law Claims*

Furthermore, I conclude that no reasonable jury could find the City defendants negligent in removing PA from Toledo's custody on December 29, 2009. They of course owed PA a duty of care when they removed him, but the facts would not support a reasonable conclusion that their conduct breached that duty. Plaintiffs do not argue that officers were negligent in any way other than in failing to properly assess whether emergency circumstances justified the removal without a court order. As discussed above, the officers permissibly made a determination that PA was in danger based on his mother's behavior, and their decision to remove him from his great-aunt's custody was therefore permissible.[9] No reasonable jury could

---

[8]     Although PA also cites *Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356 (E.D.N.Y. 2011), the basis of that decision is not clear to me from the opinion. The court found a triable issue of fact as to whether the plaintiffs had identified a policymaker who could bind the City and create *Pembaur* type liability. *Id.* at 371. But the question of whether an official has final policymaking authority is one of law. *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). Moreover, the *Estiverne* opinion appears to conflate the distinct issues of decision-making authority and *policy*-making authority. 833 F.Supp 2d at 371 ("Furthermore, defendants have presented no evidence to suggest that anyone but [the individual defendant in charge] had final decision-making authority in this area."). In any event, the plaintiffs in this case have simply not offered evidence that Gibbs had the relevant type of policymaking authority.

[9]     In addition, I note that the defendant officers complied with relevant state law in making their removal decision. Such compliance does not conclusively demonstrate the absence of negligence, *see, e.g., Tufariello v. Long Island R. Co.*, 458 F.3d 80, 91 (2d Cir. 2006) (citing cases), but it is relevant evidence, *see id.* Here, a jury could not fail to find that the officers had "reasonable cause to believe that the child [was] in such circumstance or condition that his or her continuing in said place of residence or in the care and custody of the

23

conclude otherwise.  Because the individual defendants were not negligent, the City is not liable on a respondeat superior theory.[10]

> 2.    *Claims Relating to PA's Foster Care*

PA alleges in his remaining claims both that his placement in foster care and his treatment while in foster care violated state and federal law.  The defendants have moved for summary judgment on all of these claims.  PA has moved for summary judgment on his fifth claim (for failure to protect him from harm while in foster care, in violation of the federal constitution) and tenth claim (state negligence for the same conduct).  In addition, Alford and JA have moved for summary judgment on their federal claims, including claims that PA was misplaced in foster care and that defendants failed to protect him; and Rodriguez moves for summary judgment on procedural and substantive due process claims.[11]

> a.  *Legal Standards*

When a child is placed in foster care, his or her governmental custodian is "charged with affirmative duties," the breach of which may violate the Constitution.  *Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981) ("*Doe I*").  In other words, "children in foster care [have] a substantive due process right to protection from harm."  *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996).  The right is "violated by professional caretakers 'only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.'"  *Phelan ex rel.*

---

parent or person legally responsible for the child's care present[ed] an imminent danger to the child's life or health," N.Y. Fam. Ct. Act § 1024(a)(i), and there is no dispute that at the time of day when the relevant events occurred, it was impossible to obtain a family court order, *see* § 1024(a)(ii).

[10]    My merits determination is bolstered by the partial protection afforded to the individuals by New York Social Services Law § 419.

[11]    Because I am holding Alford's and JA's claims in abeyance while I determine whether to appoint guardians for either (or both) of them, *see* Section D.3, *infra*, I do not rule on their claims, even though they mirror PA's.

*Phelan v. Torres*, 1:04-CV-03538-ERK, 2011 WL 6935354, at *6 (E.D.N.Y. Dec. 30, 2011)

(quoting *Youngberg v. Romeo,* 457 U.S. 307, 323 (1982)).  The standard of care "'is essentially a

gross negligence standard.'"  *Id.* (quoting *Doe v. N.Y.C. Dep't of Soc. Servs.,* 709 F.2d 782, 790

(2d Cir. 1983) ("*Doe II*")).

   Here, plaintiffs have sued both the City (and its employees) and a private

organization, St. Vincent's (and its employees), to which the City delegated substantial

responsibility.  St. Vincent's concedes for the purposes of the summary judgment motions that it

was acting under the color of state law and may therefore be sued under § 1983.  *See* St.

Vincent's Br. at 7 n.2, ECF No. 345 in No. 10-cv-4661.  Courts have extended *Monell*'s

limitations on respondeat superior liability to private organizations acting under color of state

law, *see, e.g., Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990), and

granted the protection of qualified immunity to individual employees of such organizations when

acting under color of state law, *see, e.g., Finch v. City of New York*, 591 F. Supp. 2d 349, 363

(S.D.N.Y. 2008).[12]

   As to the City, although it has delegated responsibility for the care of foster

children to agencies such as St. Vincent's, "the State and City remain ultimately responsible for

the child's welfare" while in foster care.  *Phillips ex rel. Green v. City of New York*, 453 F. Supp.

2d 690, 737 (S.D.N.Y. 2006) (internal quotation marks omitted).  The City may therefore be

liable under a *Monell* theory if it has an official policy or custom that causes violations of foster

children's rights, or if it is deliberately indifferent to those rights when it delegates authority to

foster agencies.

   *b.  Claims Against St. Vincent's*

---

[12] For his part, PA also does not appear to dispute that qualified immunity is at least potentially
available to the individual St. Vincent's defendants.  *See* PA Reply Br. at 32-33, ECF No. 363, in No. 10-cv-4661.

Genuine disputes of material fact persist with respect to these claims, precluding judgment as a matter of law.

Based on record evidence, a jury could reasonably find that St. Vincent's employees had notice of PA's need for immediate psychiatric treatment and care, and failed to properly discharge their duties to him.  That evidence could reasonably give rise to a finding that St. Vincent's employees were grossly negligent.  For similar reasons, I cannot conclude on this record that, as a matter of law, St. Vincent's employees should be protected by qualified immunity, since, *if* the jury finds that their conduct was illegal, it violated clearly established rights of which a reasonable official would have known.

The evidence adduced by the plaintiffs documents occasions on which PA attempted to run away or said that he would do so.  For example, on January 8, 2010, Rodriguez (along with her sister, as well as Toledo) visited PA and JA under St. Vincent's supervision. According to the Progress Notes entry, PA repeatedly said that he was going to leave with his mother, and that he was going home; he also kept trying to leave the office, even when his mother was present.  *See* Ex. Q at 27, ECF No. 315-17, in No. 10-cv-4661.  Anderson (the author of the note) admitted that she "was only able to focus on [PA] and keeping him from running away."  *Id*. at 28.  The Progress Notes also show that on a January 21 visit to the foster home, PA kept trying to unlock the door and leave.  *Id*. at 43-44.

The evidence includes indications of stress and erratic behavior sufficient for an expert to believe that PA needed immediate medical attention.  An intake interview performed by a St. Vincent's psychologist, Eugene Plotnick, on January 14, 2010, suggested that PA needed immediate psychiatric evaluation.  In several places in his one-page memorandum summarizing the intake (which was sent to Sister Elizabeth Mullane, who was in charge of St. Vincent's

medical department), Dr. Plotnick stated that PA needed urgent attention and also said that he

"wanted to expedite a psychiatric evaluation and treatment intervention."  Ex. W to PA SJ Mot.,

ECF No. 315-23 in No. 10-cv-4661.  The note also discussed PA's violent outbursts, difficulty

concentrating, lying, and claims that he wanted to kill his sister, JA.  In addition, PA exhibited

what Dr. Plotnick thought might be psychotic features, saying that "Jason is inside me, he's

telling me what to do," and saying that his legs were trying to make him get out of his chair.  Of

course, it is also true that Plotnick judged that PA was not an "imminent risk to self or others,"

*id*., which is among the reasons why summary judgment in favor of the plaintiffs is also not

appropriate.

Other incidents seem to confirm Plotnick's concerns.  For example, at the January

21 visit, PA said that he wished he were dead; he also attempted to cut himself with scissors.  Ex.

Q.  His foster mother reported a variety of alarming behavior, such as smearing feces on the wall

and hitting other children, *id.* at 35, and incidents where he would hit himself in the head and say

"oh, my head, my head," *id*.  He also threatened to kill his sister.  *Id*. at 39.

From this and other evidence, a jury could reasonably find that PA's behavior

demanded greater urgency and more attention than PA's caregivers provided.  At the same time,

a jury could also reasonably conclude that the defendants' response to the warning signs did not

amount to gross negligence.  For these reasons, summary judgment is not appropriate on the

claims against Anderson and Villalta.[13]

Finally, the determination of qualified immunity in this case turns on the facts, not

on any judgment about legal uncertainty.  Accordingly, a grant of qualified immunity to these

---

[13]     For the same reasons, plaintiffs' state negligence claims against the individual St. Vincent's employees will also proceed to trial, since the liability standard (ordinary negligence) is lower than for the constitutional torts (gross negligence) alleged in the federal § 1983 claims, though at trial the defendants will be able to argue for state law immunity under New York Social Services Law § 419.

defendants is not appropriate at this time.  If a jury finds that the individual defendants were

grossly negligent, then their conduct violated clearly established rights, and no reasonable person

in their position could have believed otherwise.  The availability of qualified immunity is a legal

question, to be resolved by the Court.  *See Negron v. City of New York*, 976 F. Supp. 2d 360, 370

(E.D.N.Y. 2013) ("Generally, whether qualified immunity applies to the conduct of a law

enforcement officer is a question of law for the court to decide." (citing *Stephenson v. Doe*, 332

F.3d 68, 80-81 (2d Cir. 2003)).  Though I acknowledge the possibility that nuanced findings of

historical fact may bear on that issue (and may warrant the submission of specific factual

questions to the jury), the critical point at this juncture is that the qualified immunity defense is

inextricably bound up in the facts of the case, and cannot be resolved at the summary judgment

stage.

      The foregoing does not settle the question of St. Vincent's own liability – under

either federal or state law – as an agency, or of the City's potential liability for delegating

responsibility to St. Vincent's.

      As to St. Vincent's, I conclude that the plaintiffs' factual presentation is

insufficient to proceed to trial on the § 1983 claims.  The plaintiffs can succeed on the federal

claims against St. Vincent's itself only if the actions of individuals can be attributed to the

agency through *Monell* or a related form of liability.  Here, PA argues that St. Vincent's should

be held liable on a failure to supervise theory:  where high-ranking officers of an agency are

deliberately indifferent to the culpable conduct of ordinary, low-ranking employees, the failure to

intervene and properly supervise those employees can be attributed to the agency itself.  *See*

*Richards v. City of New York*, 433 F. Supp. 2d 404, 424 (S.D.N.Y. 2006) (for substantive due

process liability for omission to perform affirmative duties, "(1) the omissions must have been a

substantial factor leading to the denial of a constitutionally protected liberty or property interest; and (2) the officials in charge of the agency being sued must have displayed a mental state of deliberate indifference in order to meaningfully be termed culpable under § 1983") (internal quotation marks omitted) (citing *Doe I*, 649 F.2d at 141). "An agency demonstrates deliberate indifference that supports a failure-to-supervise claim if it should have known that inadequate supervision was so likely to result in the violation of constitutional rights" that the agency's supervisory personnel "can reasonably be said to have been deliberately indifferent to the need." *Id*. (internal quotation marks and alterations omitted).

PA relies substantially on *Doe I*, in which the Second Circuit found an agency liable for the culpable conduct of lower-ranking officers because "the causal link between the agency's alleged failure to supervise and the continuation of [the victim's] abuse is clear." 649 F.2d at 144. In *Doe I*, the Catholic Home Bureau, a foster agency, spent more than a decade gradually coming to the realization that a child had been abused. *See id*. at 137-40. Agency officials were presented with numerous red flags, including a specific medical assessment that the child had been abused, but did not act for at least two years. *Id*. at 139. Although the opinion does not give much detail about what makes "clear" the "causal link," the causal link here is anything but clear, and PA's allegations about supervisory personnel at St. Vincent's are especially thin. PA points to two specific conversations between Villalta and Theodora Diggs, a director at St. Vincent's, and Mullane, the head of St. Vincent's medical department, about Plotnick's evaluation. But those two conversations over the three-week period in which St. Vincent's had custody of PA could not reasonably give rise to an inference that high-ranking St. Vincent's officials were deliberately indifferent to the risks to PA.

However, state law is different:  ordinary principles of respondeat superior govern whether St. Vincent's might be liable for its employees' tortious conduct.  The issue is barely argued, but I do not see on this record a basis to grant summary judgment to either side on the plaintiffs' state negligence claims against St. Vincent's.  Thus, those claims may proceed to trial alongside the state and federal claims against the individual officers.

### c.  Claims Against the City

Plaintiffs' allegations that the City has a policy of "abandoning" children in foster care and "abdicating" responsibility over them are insufficient to support their claim.  No reasonable jury could find from the evidence adduced that the City has a policy of abandoning care over foster children, or that the City is deliberately indifferent to their care.

D.       *Defendants' Summary Judgment Motions*

Both St. Vincent's and the City Defendants move for summary judgment on all the plaintiffs' remaining claims.

### 1.       PA's Remaining Claims

### a.  Claims About Kinship Placement

The City Defendants argue that PA's second and third claims should be dismissed because PA has provided no evidence that the City has a policy of failing to place children with relatives, or a policy of failing to remove children from non-kinship foster care once it is clear that suitable relatives are available.

The record and argument on these claims are not well-developed.  As alleged against the City, PA must show that he was harmed by City policy or practice.  On the second claim (failure to initially place with kin), PA has adduced essentially no evidence demonstrating that the City has a policy of failing to place children with relatives instead of in foster care.

Accordingly, summary judgment on that claim is appropriate in favor of the City.  To the extent

the claim is alleged against individual ACS agents, the City's briefing does not make a clear

argument why summary judgment should be granted, and the motion is therefore denied.

On the third claim (failure to change placement to kinship), PA has pointed to

documents outlining the role of the Initial Child Safety Conference and a follow-up conference

held at most twenty days later, during which time ACS will not generally attempt to change the

assignment of a child.  *See, e.g.,* Initial Child Safety Conference (CSC) Brief Policy at 13, ECF

No. 351-5 (describing follow-up conference to be scheduled "no later than twenty (20) days after

the first Child Safety Conference").  He also points out that, in this case, the City quickly (within

one day) cleared the home of Ms. Mercado, a relative, but did not attempt to move him from

foster care to her care.  A triable issue therefore remains, and the motion is denied to the extent it

seeks dismissal of that claim.

### b.  *Claims About Moran's English Competency*

The City and the St. Vincent's defendants also claim that PA has failed to raise a

triable issue on his claim that he should have been placed with an English-speaking foster

mother.[14]  The record clearly reflects a genuine dispute over Moran's competency in English.

For example, PA cites a Foster Home Recertification Report in which Moran is listed as having a

"weakness" of being "limited in English."  Ex. G to PA Reply at 9, ECF No. 364-7 in No. 10-cv-

4661.  PA cites other evidence as well, including in Ex. E, F, H, and I to the reply.  Thus, the

underlying issue is disputed.  But that is not enough – the claim is raised against municipal

defendants whose potential liability is limited by the principles set forth in *Monell*.  On that

---

[14]       Neither group of defendants contests the legal sufficiency of either claim about placement.  That is, no defendant contests that PA has a substantive due process right to be placed with a family member over a non-kin foster parent, and no defendant contests that PA has a substantive due process right to placement with a linguistically compatible foster parent.  Furthermore, no party argues that the relevant individuals responsible for PA's placement should be granted qualified immunity.

31

score, though the issue is a close one, I conclude that summary judgment is inappropriate.  PA

has shown that the placement with Moran was a result of an automatic computer match, *see* PA

56.1 Response ¶ 51, but he has provided very little information about the operation or effects of

that system beyond this case.  However, Susan Pope, an employee of St. Vincent's who oversaw

PA's placement into Moran's home, seems to have admitted in a deposition that competency in

English was not a factor in the system's matching of foster parents with children.  *See* Pope Dep.

at 57:25-60:15, ECF No. 364-2.  She also said there were no written policies designed to ensure

linguistic compatibility, and she had never been instructed to "take language compatibility into

account" in making a placement decision.  *See id*. at 69:9-21.  Viewed in the light most favorable

to PA, these descriptions of the matching process satisfy the *Monell* standard.

Finally, St. Vincent's and the City appear to blame each other for any errors in the

placement, and the record does not conclusively show whether either defendant (or both) should

be held responsible if PA can succeed.  The question of responsibility is one of fact, not of law,

and is therefore reserved for trial.

### c.  *Claims Against John Mattingly*

The City contends that John Mattingly, the former Commissioner of ACS, should

be dismissed from the case because PA has provided no evidence of his personal involvement

with any of the alleged misconduct.  I agree and grant this motion.  PA's evidence on this point –

which is essentially that the complained-of policies continued in existence during Mattingly's

tenure – do not show the requisite personal involvement or mental state for supervisory liability

under any standard.  *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013)

(declining to consider whether *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) "heightened the

requirements for showing a supervisor's personal involvement with respect to certain

constitutional violations," since the complaint did not plead an adequate case even under the standard of *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)); *see generally Turkmen v. Ashcroft*, 915 F. Supp. 2d 314, 333-36 (E.D.N.Y. 2013) (discussing effect of *Iqbal* on supervisory liability in civil rights cases, and holding that *Iqbal* only meant to require the supervisor to share the same mental state as the primary tortfeasor in order to be liable).

### d.  Other Claims

Finally, the City has moved for summary judgment on all of PA's remaining state law claims.  But it argues only that those claims should be dismissed because the federal law claims should be dismissed, in which event I should decline to exercise supplemental jurisdiction over the state law claims.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim [properly before the court] if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").  Since some of PA's federal claims remain in the case, the argument fails.

St. Vincent's argues for dismissal of PA's state claims on the same grounds, but also argues in the alternative that summary judgment is proper on the merits.  PA's state law claim that he was improperly placed with a non-English speaker remains in the case for the reasons I discussed above.

St. Vincent's also argues that PA's negligence claims (that he was inadequately supervised or cared for) and his claims for negligent and intentional infliction of emotional distressed should be dismissed.  For essentially the reasons discussed already as to other claims, the record would permit a reasonable jury to find in PA's favor on the negligence claim, and summary judgment is denied.

The emotional distress claims are more nuanced.  Under New York law, a cause of action for negligent infliction of emotional distress is permitted under three circumstances:  on a "bystander" theory, when the plaintiff witnesses an injury to another person; on a "direct duty" theory, when "a plaintiff suffers emotional distress caused by defendant's breach of a duty which unreasonably endangered plaintiff's own physical safety"; or "where there is an especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious." *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (internal quotation marks, alterations, and citations omitted).  Although the bystander theory is clearly inapplicable here, the defendants have presented no significant argument on the applicability of the second or third theories, and summary judgment is accordingly denied.

Intentional infliction of emotional distress is another matter.  "Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (citing *Howell v. New York Post Co.,* 612 N.E.2d 699 (1993)).  Liability is proper "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society," *id*. (internal quotation marks omitted), and the question of whether the conduct is so outrageous and extreme as to permit liability is a threshold question of law for the court to decide, *see id*.  I conclude that PA has not adduced evidence of sufficiently outrageous conduct to meet New York's high standard.  That is, as a matter of law, even if PA's allegations are true, St. Vincent's did not commit any action that was "atrocious" or "utterly intolerable in a civilized

34

society." Even if St. Vincent's employees were grossly negligent in caring for PA, a question

reserved for trial, the record still shows a good faith attempt to care for PA; their conduct did not

approach the kind of intolerable acts meant to be covered by the law. PA's intentional infliction

of emotional distress claim is therefore dismissed.

Finally, St. Vincent's does not directly address PA's false imprisonment claim,

which therefore may proceed to trial.

2.    *Rodriguez's Claims*

At the outset, I note that while Rodriguez did move affirmatively for summary

judgment, *see* ECF No. 361, she filed no papers in opposition to the defendants' motions for

summary judgment. Although the defendants have requested that I treat their motions as

unopposed as a result, *see* ECF No. 376, I will not do so, but will instead (as I indicated at oral

argument) treat Rodriguez's affirmative motion, ECF No. 361, as an opposition to the

defendants' motions to the extent the facts and arguments she advances address the defendants'

arguments.

On the recommendation of Magistrate Judge Gold, *see* ECF No. 305 ("January

R&R"), I permitted Rodriguez leave to submit her Third Amended Complaint ("TAC"), ECF

No. 298, which is currently operative in this case. I adopted Judge Gold's recommendations, and

therefore his construction of the TAC – including whether certain causes of action should be

permitted – are now the law of the case, and I will not revise those holdings without good reason.

In particular, Judge Gold's recommendation was that Rodriguez's first claim

(titled "substantive due process," and nominally leveled against all the defendants in the case) be

construed as a procedural due process claim against the City defendants only. *See* January R&R

at 6-8. That is because both the law and the facts alleged in the TAC support this claim only as it

relates to PA's initial removal.  However, for the same reasons I discussed above with respect to PA's own claim, defendants are awarded summary judgment on these claims.

Rodriguez's second and third causes of action are procedural and substantive due process claims against various defendants for PA's placement in, and then improper care during, foster care.  Judge Gold noted that the Second Circuit has not defined the contours of such rights (if any) under the Constitution, but he recommended permitting the claims to proceed, since they might be resolved on factual rather than legal grounds.  *See* January R&R at 9-10.  The time has now come to rule on their legal merit.

I grant judgment to all defendants on Rodriguez's second claim, for violations of procedural due process.  Though Rodriguez has a protected liberty interest in "the nature and quality of foster care received by her child, separate and apart from any claim arising from the fact of the child's removal," the record does not demonstrate that Rodriguez was denied notice and an opportunity to be heard with respect to that liberty interest.  July R&R at 9.  Specifically, Rodriguez cannot convincingly argue on the facts before me that the procedures New York provides fail to afford sufficient protection to her parental rights under the balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976).  She has not shown that, under the second *Mathews* factor, the existing procedures are likely to cause an erroneous deprivation of her assumed rights with respect to her child.  *See id*. at 335.  Furthermore, under the third factor in *Mathews*, I must also consider the state's countervailing interests as against the claimant.  *See id*. at 335.  Here, the government's interests include protecting a child from the alleged abuse or neglect of the parent and the interest in promptly placing the child in a safe environment.  These state interests are strong, and I cannot say on this record that Rodriguez has established that the existing family court procedures err impermissibly on the side of the government.  *Cf. Wilkinson ex rel.*

36

*Wilkinson v. Russell,* 182 F.3d 89, 104 (2d Cir. 1999) ("Although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.") (internal quotation marks omitted).

Another part of the third *Mathews* factor is "the probable value, if any, of additional or substitute procedural safeguards." *Id.* at 335. Rodriguez has not proposed specific additional procedures that would help safeguard her interest while maintaining a workable system for emergency placement of children in foster care, and I do not intuit any.

Instead, Rodriguez mainly argues that her procedural due process rights were violated because PA's disappearance effectively terminated her parental rights without the hearing contemplated by state law. That contention confuses the issue. The question of whether PA's disappearance is ultimately attributable to any of the defendants is a matter of substantive due process. PA's disappearance does not also violate procedural due process.

Rodriguez also appears to allege a separate procedural due process violation – she claims that she was entitled to additional information about her child's increasingly serious psychological condition during the time he was in foster custody. Because she has provided very little evidence on this latter claim, I need not decide its precise legal contours, and I grant judgment to defendants on this claim as well.

Rodriguez's substantive due process claim presents a closer question. Defendants are correct that "outside of removal or the compulsory provision of medical care, the Second Circuit has not specified what other kinds of government action may violate a parent's protected liberty interest in the care, custody and management of his or her child." *Phillips v. Cnty. of*

37

*Orange*, 894 F. Supp. 2d 345, 374 (S.D.N.Y. 2012).  But as Judge Gold noted, "that the Circuit

has not held that a claim is available hardly constitutes binding precedent barring its assertion."

January R&R at 9.

 And precedent does, of course, acknowledge the liberty interest in the parent-

child relationship; that is a necessary first step in the many procedural due process cases cited

above.  A parent's interest extends to "the fundamental right of parents to make decisions

concerning the care, custody, and control of their children."  *Troxel v. Granville*, 530 U.S. 57, 66

(2000).  The question here is what sorts of state action are so egregious that they violate that

interest as a substantive matter.  The cases cited in *Troxel* demonstrate that the right against state

interference in the parent-child relationship is broad.  In *Troxel* itself, the Supreme Court found

the right violated by a Washington statute permitting a state trial judge to grant any person the

right to visit a custodial parent's child.  That holding is consistent with cases such as *Quilloin v.

Walcott*, 434 U.S. 246, 255 (1978), recognizing that state custody and family laws are

backstopped by the federal Constitution.  Indeed, the Court has held in cases such as *Wisconsin

v. Yoder*, 406 U.S. 205 (1972) that a parent has an affirmative right to make decisions about her

child's upbringing.  *See id*. at 229-36 (holding that state could not compel Amish parents to send

children to public schools, relying on parents' rights to free exercise of religion and rights to

determine the moral and religious upbringing of their children); *see also, e.g., Pierce v. Soc'y of

Sisters*, 268 U.S. 510, 534 (1925).

 Thus, though I am not cited to precedent directly on point, I conclude that a parent

has a sufficiently strong interest in the care and management of her child that she may maintain a

substantive due process action under § 1983 at least when a state custodian (or, as here, a state

custodian's designee) is allegedly deliberately indifferent to the child's care.  Such a right is the

38

parent's own, and not a right asserted on the child's behalf, since the parent is independently

harmed when others fail to properly care for the child.  However, because I conclude that in this

particular case the claim may not proceed to trial as to either the municipal or individual

defendants, I will not attempt to set forth the precise contours of such a cause of action.

Rodriguez's claim against the individual defendants of failure to care for PA is

barred by qualified immunity.  As just discussed, Rodriguez has cited no case holding that

parents have a specific right to control a child's upbringing that is violated when a state

custodian fails to properly care for the child.  It is true that state actors would have independent

legal reason not to be deliberately indifferent to the child's care – such indifference would

violate (at least) the child's own federal constitutional rights.  But any rights of the *parents* were

not clearly established at the time of the alleged violation, and so individual officers may not be

held liable under § 1983 for a violation.  As alleged against the City and St. Vincent's, the claim

fails because Rodriguez has provided no evidence showing that her son's allegedly inadequate

care resulted from a policy or practice.  Thus, the claim against the municipal entities fails to

reach the *Monell* threshold.

Finally, Judge Gold recommended against permitting the fourth claim in the TAC,

which he construed as a Fourth Amendment claim, *see* January R&R at 10-11, and also

recommended against permitting Rodriguez's fifth claim, a state law negligence claim, *see id.* at

11-13.  Because I adopted the R&R and continue to agree with Judge Gold's analysis, neither of

those claims is at stake now.

3.      *Remaining Claims of Alford and JA*

The defendants have moved for summary judgment against Alford and JA,

arguing that Alford and JA's Second Amended Complaint ("Alford SAC"), *see* ECF No. 16 in

No. 11-cv-1583, which contains many claims similar to those of PA and Rodriguez, should be dismissed in its entirety.  However, the defendants have also written suggesting that Alford may not be competent to proceed on his own behalf because of injuries he sustained in a shooting in early 2012.  *See* July 8, 2014 letter, ECF No. 115 in No. 11-cv-1583.  Furthermore, the defendants argue that because Alford does not currently have physical custody of JA, he may not represent her.  *See* July 21, 2014 letter, ECF No. 121 in No. 11-cv-1583 (citing N.Y. C.P.L.R. § 1201).

The factual record underlying these two arguments is not sufficiently developed. Based on the submissions so far, it may be necessary to appoint guardians for Alford or JA (or both).  Until those questions are decided, it would be irresponsible for me to resolve arguments that could terminate their claims.  I am not certain why a separate guardian would be necessary to protect Alford's interests, since he already has a lawyer.[15]  But my concern for JA's rights is greater:  if Alford is either not mentally competent to represent JA, or, even if competent, he is not legally entitled to do so, then her case (and the arguments against her case) should certainly not proceed until a legal representative can appear on her behalf and decide how best to prosecute her claims.

For these reasons, I will not yet rule on the pending summary judgment motions with respect to Alford and JA, though obviously any future rulings I make on these motions will be guided by and consistent with my rulings with respect to PA and Rodriguez.

CONCLUSION

For the foregoing reasons, PA's motion for summary judgment is denied; Rodriguez's motion for summary judgment is denied; and the defendants' motions for summary

---

[15]      For example, I do not see why Alford's current counsel could not also serve the role of guardian ad litem, should that be necessary.  No party has given me a reason to believe that Alford's interests are in some way adverse to those of his lawyer.

judgment are granted in part and denied in part.  Any motion practice with respect to the claims of Alford and JA is deferred pending evaluation of Alford's competency and ability to represent JA.  I will hold a status conference on Monday, September 22, 2014, at 11:00 am to discuss next steps in the case.

So ordered.


John Gleeson, U.S.D.J.


Dated:  September 11, 2014
        Brooklyn, New York

41